# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

| | | |
|---|---|---|
| **S. M. L.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 18-04224-CV-C-NKL** |
| | ) | |
| **PULASKI COUNTY, MISSOURI, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

**COMES NOW,** Plaintiff, S. M. L., by and through undersigned counsel, and for her First Amended Complaint against Defendants Pulaski County, Missouri, ("Pulaski County"), Board of County Commissioners for Pulaski County, Missouri, ("Pulaski Board"), Jimmy Bench ("Bench"), Ron Long ("Long"), John/Jane Doe #1 ("Doe"), and Donald E. Sapp ("Sapp"), Plaintiff states and alleges as follows:

### PRELIMINARY STATEMENT

1.    This is an action for damages brought to redress the deprivation, under color of state law, of rights, privileges and immunities secured to Plaintiff by provisions of the Eighth and Fourteenth Amendments of the United States Constitution and the laws of the State of Missouri.

2.    Plaintiff, a female, alleges that while being transported from the Chillicothe Correctional Center ("CCC") to the Pulaski County, Missouri Jail ("PCJ") by Defendant Sapp of the Pulaski County, Missouri Sheriff's Department ("PCSD"), she was forcibly subjected to sexual fondling, touching, and other egregious sexual contact in violation of her right to bodily integrity and right to privacy. As a direct and proximate result of: a) Defendant Sapp's sexual misconduct; and b) Defendants Pulaski

{11433/0001: 00380706.DOCX.}

Case 2:18-cv-04224-NKL   Document 45   Filed 02/25/19   Page 1 of 52

County, Pulaski Board, Bench, Long, and Doe's deliberate indifference to substantial risks of serious harm to prisoners and their collective failure to take sufficient remedial actions to prevent the same, actions and inactions occasioned by Defendants under color of state law, Plaintiff not only suffered from a terrifying and humiliating sexual assault, which served no legitimate penological purpose, but she experienced severe psychological and emotional trauma as well.

3.     Plaintiff's injuries are the product of Defendant Sapp's deliberate indifference to her constitutionally protected rights.  As such, Defendant Sapp's sexual misconduct, committed while Defendant Sapp was in uniform and Plaintiff was shackled, interferes with rights implicit in the concept of ordered liberty because it is shocking to the conscience and offensive to human dignity.

4.     Plaintiff's injuries are also the product of Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe's promulgation and/or tacit authorization of departmental and institutional policies, procedures, customs, practices, and actions/inactions that not only contemplate a deliberate and systemic disregard for known, obvious, and excessive risks to inmate health and safety, but are also very likely to culminate in sexual offenses perpetrated by PCSD personnel against Plaintiff and the PCJ inmate population as a whole.  Said policies, procedures, customs, practices, and actions/inactions contemplate a continuing, persistent, and widespread pattern of official misconduct that comprises the moving force behind Plaintiff's injuries and evidences deliberate indifference to the health and safety of all inmates confined to and transported to the PCJ in violation of the Eighth and Fourteenth Amendments of the United States Constitution and the laws of the State of Missouri, giving rise to both federal and state law claims.  Plaintiff makes demand for a jury trial on all claims set forth herein.

{11433/0001: 00380706.DOCX.}

2

## JURISDICTION AND VENUE

5.      As Plaintiff presents Federal claims arising under the Eighth Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment, the Fourteenth Amendment itself, and 42 U.S.C. § 1983, jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.  Pursuant to 28 U.S.C. § 1367, this Court also has jurisdiction to hear Plaintiff's supplemental state law claims because all claims made herein are so related to each other that they form part of the same case or controversy under Article III of the United States Constitution.

6.      This Court has jurisdiction over the Defendants because the unlawful acts alleged in herein were committed in Marshall County, Missouri, Morgan County, Missouri, and Waynesville, Pulaski County, Missouri, all of which lie within the Western District of Missouri.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 105(b) and 1391 because a substantial part of the events and/or omissions giving rise to Plaintiff's claims occurred in Marshall County, Missouri, Morgan County, Missouri, and Waynesville, Pulaski County, Missouri, all of which lie within the Western District of Missouri, and because, upon information and belief, some of the individual Defendants reside within the Western District of Missouri.

## PARTIES

8.      Plaintiff, S. M. L. ("S. L."), is a citizen of the United States and was, at all relevant times contemplated herein, an inmate in the custody of the Missouri Department of Corrections ("MDOC").   At the time of the events that gave rise to her claims, S. M. L. was confined to the CCC in Chillicothe, Livingston County, Missouri,

where she was serving time on an unrelated charge. S. L. is currently confined to the Laclede County Jail in Lebanon, Missouri.

9. Defendant Pulaski County is a Third-Class county and a political subdivision of the State of Missouri, duly organized and existing under the laws of Missouri. Upon information and belief, Pulaski County not only maintains a Sheriff's Department, administered by an elected Sheriff, but it is also served by, *inter alia*: a Board of Commissioners, an elected body vested with final decision-making authority over departmental budgets, including that of the Sheriff's Department; and a County Counselor/Attorney, an elected official who provides legal advice to elected officials and county law enforcement agencies, including the Sheriff and the Sheriff's Department.

10. Defendant Board of County Commissioners for Pulaski County, Missouri ("Pulaski Board") is an elected executive body of Pulaski County with final decision-making authority over the annual county budget, including over departmental budgets like that of the Sheriff's Department. Upon information and belief, the Sheriff of Pulaski County makes annual reports to the Pulaski County Board detailing the effectiveness of the Sheriff's Office in meeting program goals and objectives.

11. Defendant Jimmy Bench ("Bench") is a citizen of the United States and was, at all relevant times contemplated herein, and while acting under color of state law, a senior member of the PCSD command staff who served as a Lieutenant prior to assuming the duties of Sheriff on January 1, 2017. Upon information and belief, as a Lieutenant, between approximately 2014 to 2016, Defendant Bench was not only vested with, directly responsible for, and materially exercised supervisory and oversight authority over all PCSD deputies – including, *inter alia*, the authority to assess job

{11433/0001: 00380706.DOCX.}

performance, take remedial/corrective action, ensure compliance with departmental policies/procedures, develop staffing schedules and duty assignments, and make employment determinations – but he was also directly responsible for receiving, investigating, and acting on complaints involving misconduct of PCSD personnel in cooperation with the Sheriff and senior command staff. Upon further information and belief, as the duly elected Sheriff of Pulaski County, Defendant Bench not only directly and materially participates in county budgetary processes that directly impact PCSD staffing levels, jail conditions, and the management of prisoners, but he is also vested with, directly responsible for, and personally exercises final decision-making authority over PCSD supervisory schemes and the allocation of personnel, position job descriptions and duties, departmental policies/procedures, jail operations, management and transport of prisoners, treatment of prisoners, employment determinations and background screening of PCSD personnel, and remedial/disciplinary actions of PCSD personnel. Upon further information and belief, Defendant Bench also personally exercises final decision-making authority over complaint investigation and resolution processes involving PCSD deputies accused or suspected of misconduct and directly participates in the same. Plaintiff brings suit against Defendant Bench in both his individual and official capacities.

12.     Defendant Ron Long ("Long") is a citizen of the United States and was, at all relevant times contemplated herein, and while acting under color of state law, the duly elected Sheriff of Pulaski County, who served between January 1, 2013 and December 31, 2016. Upon information and belief, as the Sheriff of Pulaski County, Defendant Long not only directly and materially participated in county budgetary processes that directly impacted PCSD staffing levels, jail conditions, and the

management of prisoners, but he was also vested with, directly responsible for, and personally exercised final decision-making authority over PCSD supervisory schemes and allocation of personnel, position job descriptions and duties, departmental policies/procedures, jail operations, management and transport of prisoners, treatment of prisoners, employment determinations and background screening of PCSD personnel, and remedial/disciplinary actions of PCSD personnel. Upon further information and belief, Defendant Long also personally exercised final decision-making authority over complaint investigation and resolution processes involving PCSD officers accused or suspected of misconduct and directly participated in the same. Plaintiff brings suit against Defendant Long in both his individual and official capacities.

13. Defendant John/Jane Doe #1 ("Doe") is a citizen of the United States and was, at all relevant times contemplated herein, and while acting under color of state law, a senior member of the PCSD command staff charged with administration of the PCJ. Upon information and belief, Defendant Doe was not only vested with, directly responsible for, and materially exercised supervisory, oversight, and final decision-making authority over the PCJ and PCSD deputies assigned to the PCJ – including the authority to assess job performance, take remedial/corrective action, ensure compliance with departmental policies/procedures, monitor the treatment of prisoners, and arrange for prisoner transport – but he/she was also directly responsible for receiving, investigating, and acting on complaints involving misconduct of PCSD personnel assigned to the Jail Division/PCJ in cooperation with the Sheriff and senior command staff. Plaintiff brings suit against Defendant Doe in both his/her individual and official capacities.

14.     Defendant Donald E. Sapp ("Sapp") is a citizen of the United States and was, at all relevant times contemplated herein, and while acting under color of state law, a duly appointed deputy of the PCSD, holding the rank of Corporal.  Upon information and belief, Defendant Sapp not only served rotating duty assignments, including prisoner transport and the PCJ, but he was required to uphold the law, safeguard prisoners, abide by departmental policies/procedures, and conduct himself in a manner becoming of a deputy of the PCSD.  Upon further information and belief, and as a corollary to his sworn oath, Defendant Sapp was also required to report instances of misconduct involving PCSD personnel to the PCSD command staff.  Plaintiff brings suit against Defendant Sapp in his individual capacity.

## GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

15.     Upon information and belief, Defendant Long served as the duly elected Sheriff of Pulaski County, Missouri from January 1, 2013 to December 31, 2016.  He was preceded by J. B. King, who served as Sheriff from 2005 to 2012.

16.     Upon further information and belief, Defendant Bench held various ranks in the PCSD before being promoted to the rank of Lieutenant sometime between 2014 and 2016, and, ultimately, being elected Sheriff in 2016.  Defendant Bench assumed the office of Sheriff on January 1, 2017.

17.     Upon further information and belief, and during the relevant times contemplated herein, the PCSD and the PCJ were/are chronically understaffed and underfunded.

18.     Upon further information and belief, the PCSD comprises two primary Divisions: the Public Safety Division and the Jail Division, which includes the PCJ.

19.     Upon further information and belief, the Jail Division/PCJ is responsible for prisoner transports to and from court, other regional correctional facilities where Pulaski County prisoners are held, MDOC facilities throughout the state, and for off-site medical treatment.

20.     In a February 17, 2014 post on the Pulaski County Sheriff's Facebook page, titled "Weekly Article, 'The Sheriff's View' (#58)," Defendant Long wrote: "The main duty by law for a County Sheriff is to maintain a jail, to secure inmates and make them available to the Court.  The Pulaski County Sheriff's Department also has the duty to keep inmates secure and healthy[.]"

21.     An article in the Waynesville Daily Guide newspaper on December 21, 2012 quoted the out-going Sheriff J. B. King: "The biggest challenge facing this department is a lack of resources."  The article further noted: "King said the department has 'half' the personnel it needs[.]"

22.     In a December 8, 2014 post on the Pulaski County Sheriff's Facebook page, titled "Weekly Article, 'The Sheriff's View' (#98)," Defendant Long wrote: "It is no secret that the Pulaski County Sheriff's Department operates at about one-third the manpower rate compared to the recommended national average of peace officers per population."

23.     In an August 16, 2015 post on the Pulaski County Sheriff's Facebook page, titled "Weekly Article, 'The Sheriff's View' (#132)," Defendant Long wrote: "I have to admit that inmate rights encompass a long list that can be challenging at times, especially when a Sheriff has limited staffing."

24.     In a March 1, 2016 post on the Pulaski County Sheriff's Facebook page, titled "Weekly Article, 'The Sheriff's View' (#158)," Defendant Long wrote: "The

current Pulaski County jail is old and dilapidated, way too small and does not meet Federal Jail standards . . . Right now the jail is minimally staffed[.]"

25.　　Upon further information and belief, and during the relevant times contemplated herein, the PCSD experienced a high rate of attrition, especially among personnel assigned to the PCJ.

26.　　Upon further information and belief, and during the relevant times contemplated herein, the PCJ was/is overcrowded.

27.　　In a March 25, 2013 post on the Pulaski County Sheriff's Facebook page, titled "Weekly Article, 'The Sheriff's View' (#11)," Defendant Long wrote: "On any given day, the Pulaski County Sheriff [sic] Department has custody of approximately eighty (80) prisoners; about one-half of those are incarcerated in Pulaski County, with the remaining being sent to neighboring county facilities."

28.　　In an October 22, 2013 post on the Pulaski County Sheriff's Facebook page, titled "Weekly Article, 'The Sheriff's View' (#41)," Defendant Long wrote: "It is no secret that the Pulaski County Jail is bursting at the seams and we are constantly seeking alternatives to our inmate population problem."

29.　　In a July 25, 2016 post on the Pulaski County Sheriff's Facebook page, titled "Weekly Article, 'The Sheriff's View' (#177)," Defendant Long wrote: "Pulaski's jail has bunk space for 54 individuals, but jail numbers recently have been ranging from 80-90 inmates . . . We are housing inmates in a renovated garage and two storage rooms to save outsourcing expenses."

30.　　PCJ understaffing and overcrowding – both of which Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe were aware – posed substantial risks of serious harm to prisoner health and safety, of which said Defendants were also aware.

31.     Upon further information and belief, and during all relevant times contemplated herein, the PCJ physical plant was/is an outdated facility that did not utilize a direct supervision/pod-concept model.   Cells were/are enclosed with perpendicular bars and organized in a linear fashion, situated opposite one another along closed corridors that were/are primarily monitored by closed-circuit television cameras.

32.     Upon further information and belief, and during all relevant times contemplated herein, jail cameras were primarily monitored by dispatch personnel, who were also charged with attending to walk-in customers, entering arrest warrants, and conducting multiple computer and database services.

33.     The physical layout of the PCJ physical plant and the remote monitoring scheme utilized by the PCSD – coupled with low staffing levels, high attrition rates among PCJ personnel, and overcrowding – made it possible for PCSD personnel to have unobserved and illicit interactions with prisoners.

34.     Upon further information and belief, and during all relevant times contemplated herein, multiple PCSD personnel assigned to the PCJ, including Defendant Sapp, engaged in sexual misconduct with prisoners on multiple occasions by brokering contraband for sexual favors, inappropriately touching prisoners through the bars in their cell doors, coercing prisoners to expose themselves or shower in view of PCSD, and taunting prisoners with sexual innuendos.

35.     Upon further information and belief, in March 2006, a PCSD jailer was arrested for and charged with having sexual contact with a prisoner.

36.     On or about June 17, 2010, PCSD jailer Joshua S. Wagner was arrested for and charged with having sexual contact with a prisoner.   Wagner confessed to

multiple illicit interactions with the prisoner between March 26 and April 4, 2010 while on duty at the PCJ.

37.     On or about September 18, 2016, PCSD jailer Angelica Black was arrested for and charged with having sexual contact with a prisoner. Black, who also facilitated the prisoner's escape, confessed to multiple illicit interactions with the prisoner between September 1 and 18, 2016 while on duty at the PCJ.

38.     Upon further information and belief, Defendant Sapp hit and killed a pedestrian with his patrol vehicle in 2008.

39.     Upon further information and belief, Pulaski County settled a civil lawsuit brought by the family of the pedestrian killed by Defendant Sapp in 2009.

40.     Upon further information and belief, Pulaski County and the PCSD failed to meaningfully investigate Defendant Sapp's fitness for duty and retained his employment despite his demonstrated propensity for violating the rights of individuals he swore to protect as an officer of the PCSD.

41.     Upon further information and belief, a PCJ inmate brought suit against Defendant Sapp regarding a 2006 prison rape by one of Sapp's fellow jailers.

42.     Upon further information and belief, the PCJ inmate's civil lawsuit alleged, in part, that Defendant Sapp denied the inmate necessary medical attention thereby violating her constitutional rights.

43.     Upon information and belief, the County and Defendant Sapp settled this lawsuit in 2009.

44.     Upon further information and belief, Pulaski County and PCSD failed to meaningfully investigate the allegations against Defendant Sapp and retained his

employment despite his demonstrated propensity for violating the rights of individuals he swore to protect as an officer of the PCSD.

45.     Upon further information and belief, and during all relevant times contemplated herein, the PCSD utilized at least two compendia of policies, procedures, and standing orders: a Policy and Procedures Manual that governs PCJ operations ("PCJ Manual"), including prisoner transports, and a General Orders Manual that governs overall operations of the PCSD.

46.     Upon further information and belief, and during all relevant times contemplated herein, each policy/order/provision in the PCJ Manual and the General Orders Manual references national jail standards – such as the American Correctional Association ("ACA") Jail Standards; is cooperatively promulgated by the Sheriff and senior PCSD command staff; periodically reviewed and revised by PCSD personnel and the Pulaski County Counselor/Attorney; and subject to final approval, signature, and implementation by the Sheriff.

47.     Upon further information and belief, the PCJ Manual provides that only one officer is needed to provide transportation of one inmate unless an U.S. Marshall inmate is involved or the inmate is deemed high risk.

48.     Upon further information and belief, the PCJ Manual provides that a female inmate should be transported by a female officer if at all possible.

49.     Upon further information and belief, the PCJ Manual does not contemplate assigning two transport officers when a female officer is not available to transport a female inmate.

50.     Upon further information and belief, the PCJ manual does not address the transport of male inmates by officers of the opposite sex.

{11433/0001: 00380706.DOCX.}

51.     Upon further information and belief, by mid-2014, all PCSD patrol cars were equipped with an external and internal video camera system.

52.     Upon further information and belief, by early-2016, all PCSD patrol cars were equipped with Rural-First, a GPS and mapping device that enables dispatchers to locate deputies and patrol cars without having to make radio contact with them.

53.     Upon further information and belief, and during all relevant times contemplated herein, the PCJ Manual and the General Orders Manual not only included general provisions implementing the Prison Rape Elimination Act (PREA), but they also included specific provisions concerning: PCSD job descriptions and duties; prisoner transports; the use of patrol car video camera systems and the Rural-First GPS capabilities; prisoner complaints and grievance mechanisms; prisoner monitoring and well-checks at the PCJ; and officer misconduct.

54.     Upon further information and belief, and during all relevant times contemplated herein, the internal patrol car video systems were seldom used by deputies during prisoner transports and/or frequently inoperable.

55.     Upon further information and belief, and during all relevant times contemplated herein, the GPS data generated by the Rural-First system in the patrol cars was seldom reviewed/analyzed to safeguard prisoners and ensure that no unauthorized stops or detours were made in the course of prisoner transports.

56.     On December 20, 2016, the Circuit Court of Pulaski County, Missouri issued an Order for Writ of Habeas Corpus ad Prosequendum directing that S. L. be retrieved from the CCC in Chillicothe, Missouri, where she was serving time on an unrelated charge, and returned to Waynesville for a probation violation hearing on January 4, 2017.

57. Upon further information and belief, and during all relevant times contemplated herein, Defendant Sapp served as a Corporal and a Senior Transport Officer for the PCSD.

58. On December 29, 2016, Defendant Sapp was assigned to execute the Writ, travel to the CCC in Chillicothe, and transport S. L. to Waynesville.

59. Defendant Sapp arrived at the CCC in Chillicothe in a fully marked PCSD patrol car and was attired in his official PCSD uniform. Pursuant to the Writ, MDOC transferred custody of S. L. to Sapp, which, as a sworn officer, he assumed on behalf of the PCSD. At the time Sapp assumed custody of S. L., she was shackled and clad in MDOC-issued prisoner attire.

60. Soon after securing S. L. in the back seat of the PCSD patrol car and exiting the grounds of the CCC, Defendant Sapp began to make solicitous comments to S. L. about her body and her figure. He told her she was "beautiful" and that he wanted to take pictures of her, so he could look at them later.

61. On the return trip to Waynesville, Rural-First GPS data indicates that Defendant Sapp made two (2) unauthorized stops with S. L. The first unauthorized stop was a commuter parking lot located across the street from a Conoco gas station, approximately five (5) miles south of Marshall, Missouri off of Highway 65.

62. While parked in the commuter parking lot, wielding the official powers of the PCSD and his law enforcement position, Defendant Sapp coerced S. L. into exposing herself. Out of fear, she complied. Nine (9) explicit photographs of S. L. – in shackles, in his PCSD patrol car – were later recovered from Defendant Sapp's cell phone.

63.     Defendant Sapp made a second unauthorized stop on a remote river access road in the Lamine River Conservation area, approximately four (4) miles East of Syracuse, Missouri, off of Highway 50.   He parked in a parking area, stepped out of the car, relieved himself, then turned and exposed his penis to S. L., shaking it at her.

64.     Upon returning to the patrol car, Defendant Sapp cleared some objects from the front seat, moving them to the trunk, and sat S. L. beside him in the front seat of the patrol car.  As he pulled back out onto Highway 50, Sapp began to belittle S. L. He reminded her that she was just an inmate, while he was a well-known and respected police officer.  Sapp also called her a "drama queen," told her about his wife and kids, and told her there would be repercussions in Pulaski County if she said anything.

65.     While continuing the drive, Defendant Sapp reached over and put his hand down S. L.'s MDOC-issued pants and penetrated her vagina with his fingers.  Sapp subsequently gave S. L. the key to her shackles and instructed her to remove them.  He then undid his uniform pants, exposed his penis, and began to masturbate in front of S.L. After several minutes of masturbation, Sapp ordered S. L. to "take care of it."  Out of fear, again, S. L. complied with Sapp's orders by performing oral sex on him. Sapp ejaculated into S. L.'s mouth.

66.     Afterwards, Defendant Sapp gave S. L. a tissue to clean herself, which she kept as evidence and later gave to a deputy at the PCJ when she was convinced that it was safe for her to do so.

67.     S. L. reported the sexual assault to a female jailer after being booked into the PCJ.  Missouri State Highway Patrol ("MSHP") launched an official investigation soon thereafter.  Defendant Sapp was placed on administrative leave and subsequently resigned from the PCSD.

68.     On January 3, 2017, Defendant Sapp was interviewed by Master Sergeant G. A. DuBois of the MSHP.  Although Sapp initially denied the allegations, he later admitted he had taken explicit photographs of S. L. with his cell phone during the transport.

69.     Subsequent DNA analyses conducted by the MSHP Crime Lab indicate that the genetic material recovered from the tissue and the coat S. L. was wearing during the transport match the genetic samples obtained from Defendant Sapp.

70.     On July 5, 2017, Defendant Sapp was formally charged with the crime of having sexual contact with an inmate.

71.     At the hands of Defendant Sapp, S. L. suffered from the unnecessary and wanton infliction of pain occasioned by a terrifying and humiliating sexual assault that not only served no legitimate penological purpose, but was utterly unrelated to any permissible criminal penalty that could have ultimately been imposed by law.  S. L.'s injuries, which were inflicted by Sapp under color of state law, were the product of his deliberate indifference to her constitutionally protected right to bodily integrity.

72.     The unnecessary and wanton infliction of pain S. L. suffered at the hands of Defendant Sapp was the product of Sapp's coercion as well as official policies, procedures, customs, practices, and actions/inactions collectively promulgated, tacitly authorized, and/or observed by Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe.

73.     Through their deliberate indifference and their reckless disregard of known risks to prisoner safety, Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe subjected S. L. to and engaged in conduct highly likely to result in the deprivation of S. L.'s constitutional right to be secure in her bodily integrity and privacy,

her right to equal protection under the law, and her right to be free from sexual assault guaranteed by the Eighth and Fourteenth Amendments.

74.    The policies, procedures, customs, practices, and actions/inactions taken and/or observed by Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe – which, through the day-to-day conduct and deliberate omissions of PCSD personnel, were so continuous, widespread, and persistent as to represent official policy – recklessly disregarded substantial risks of serious harm to prisoners and inflicted injuries that are actionable under 42. U.S.C. § 1983.

75.    Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe's abdication of policy-making and oversight responsibilities; their implementation/observation of inadequate policies, procedures, customs, practices, and actions/inactions; their failure to exercise adequate supervision, direction, and remedial control over the PCJ facility and PCSD personnel; and their collective, tacit authorization of deputy misconduct rose to the level of deliberate indifference, created systemic constitutional deficiencies, and culminated in a constitutional injury.

76.    More specifically, the policies, procedures, customs, practices, and actions/inactions that Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe observed and/or tacitly authorized – coupled with their failure to exercise adequate supervision, direction, and remedial control over PCSD personnel and the PCJ – gave rise to actionable systemic deficiencies by:

a.    Failing to provide the PCSD and PCSD personnel with adequate resources and tools to meet departmental objectives and/or comply with prevailing correctional practices, including, but not limited to, the allowance of single officer transport of offenders of the opposite sex;

b.      Failing to utilize formal periodic auditing processes to apprise command staff on intra-agency compliance with established performance indicators, policies, standards, and internal controls;

c.      Failing to utilize adequate staffing levels for the Jail Division/PCJ, such that personal interactions between PCSD personnel and prisoners often went undetected or were otherwise not scrutinized;

d.      Failing to properly and routinely utilize and review existing monitoring devices – including PCJ video cameras, Rural-First GPS data, and internal patrol car cameras – to ensure the safe transport of prisoners;

e.      Failing to utilize adequate supervisory and management schemes, such as direct supervision principles, so as to safeguard the rights of prisoners, ensure their safety, and minimize the potential for inappropriate contacts with PCSD personnel;

f.      Failing to protect prisoners from any sexual contact with or sexual exploitation by PCSD personnel;

g.      Failing to utilize adequate recruiting, hiring, and screening processes for PCSD personnel, including jailers;

h.      Failing to investigate and consider off-duty conduct in evaluating the performance of PCSD personnel;

i.      Failing to receive, investigate, and/or act on prisoner grievances and complaints of officer misconduct;

j.      Inculcating a fear of reprisal among prisoners, especially female prisoners, that compelled them not to report instances of officer sexual misconduct; and

k.      Fostering a Don't-Ask-Don't-Tell culture among Jail Division/PCJ personnel that allowed officers to exploit and objectify prisoners for their personal gratification with impunity.

77.     The eleven (11) systemic deficiencies outlined in Paragraph 76, above, are the product of official policies, procedures, customs, practices, and actions/inactions that were promulgated, occasioned, and/or tacitly authorized by Pulaski County personnel who were vested with final decision-making authority in like matters – and all eleven (11) caused or materially contributed to: the systemic and deliberate indifference to S. L.'s constitutional right to be free from cruel and unusual punishment and the unnecessary and wanton infliction of pain she experienced.

78.     Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe's official policies, procedures, customs, practices, and actions/inactions, and those of the PCSD as a whole, which comprise the moving force behind S. L.'s injuries – specifically set forth in Paragraph 98, below, operated to deprive S. L. of her right to bodily integrity and privacy, and right to equal protection under the law, and, but for the same, she would not have been denied rights secured by the Eighth and Fourteenth Amendments to the United States Constitution.

79.     Defendants Pulaski County, Pulaski Board, Bench, Long, Doe, and Sapp's acts and omissions not only contemplate a conscious disregard of a substantial risk of serious harm to prisoner health and safety – which Defendants knew were highly likely to occasion constitutional violations in light of the recent 2016 incident between jailer Angelica Black and an inmate – but said acts and omissions are also sufficiently harmful to evidence deliberate indifference to the constitutional rights of the inmates in their charge, including S. L.

80.     Defendants Pulaski County, Pulaski Board, Bench, Long, Doe, and Sapp's acts and omissions were not only intentionally willful, wanton, reckless, and malicious – in that they are the product of conduct and deliberate policy choices made despite substantial risks of serious harm, of which Defendants were aware – but they also evince a complete and deliberate indifference to and/or a conscious and reckless disregard of the rights of S. L. and all prisoners in the custody of the PCSD.  Therefore, S. L. is entitled to an award of punitive or exemplary damages in an amount sufficient to both punish said Defendants and deter others from engaging in like conduct in the future.

81.     S. L. is entitled to recover her reasonable attorney fees, costs, and expenses from Defendants Pulaski County, Pulaski Board, Bench, Long, Doe, and Sapp as provided by 42 U.S.C. § 1988.

**COUNT I – 42 U.S.C. § 1983**

**LIABILITY FOR POLICY OR CUSTOM**

**(AGAINST DEFENDANTS PULASKI COUNTY, PULASKI BOARD, BENCH, LONG, AND DOE IN THEIR OFFICIAL CAPACITIES)**

82.     Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1-81, above.

83.     At all relevant times contemplated herein, and while acting under color of state law, Defendant Long served as the duly elected Sheriff of Defendant Pulaski County that preceded Defendant Bench.

84.     As Sheriff, Defendant Long not only directly and materially participated in county budgetary processes that have a direct impact on PCSD staffing levels, jail conditions, and the management of prisoners, but he was also vested with, directly responsible for, and personally exercised final decision-making authority over all aspects

{11433/0001: 00380706.DOCX.}

of departmental operations. His mandatory functions included, *inter alia*, making determinations that concern: PCSD supervisory schemes and allocation of personnel/duty assignments; position job descriptions and duties; employment decisions and background screening of PCSD applicants; jail operations and conditions; management and transport of prisoners; citizen/prisoner complaint investigation and resolution processes involving PCSD deputies accused or suspected of misconduct; and remedial/disciplinary actions of PCSD personnel.

85.     By virtue of his office, Defendant Long was also vested with final decision-making authority over all PCSD policies, procedures, and orders. As such, Long was required to periodically review and revise the departmental/institutional directives outlined in the PCJ Manual and the General Orders Manual – which are cooperatively promulgated with the Pulaski County Counselor/Attorney, with input from senior command staff – and sign/approve them before they are given effect.

86.     Through his action/inaction on matters, processes, and concerns that impact the overall operations of the PCSD, Defendant Long was similarly empowered to tacitly approve or otherwise give official effect to practices and customs.

87.     At all relevant times contemplated herein, and while acting under color of state law, Defendant Bench held positions in the senior command staff of the PCSD, first as a Lieutenant and then as the duly elected Sheriff of Defendant Pulaski County.

88.     As the duly elected Sheriff of Defendant Pulaski County, Defendant Bench not only directly and materially participates in county budgetary processes that have a direct impact on PCSD staffing levels, jail conditions, and the management of prisoners, but he is also vested with, directly responsible for, and personally exercises final decision-making authority over all aspects of departmental operations. His

mandatory functions include, *inter alia*, making determinations that concern: PCSD supervisory schemes and allocation of personnel/duty assignments; position job descriptions and duties; employment decisions and background screening of PCSD applicants; jail operations and conditions; management and transport of prisoners; citizen/prisoner complaint investigation and resolution processes involving PCSD deputies accused or suspected of misconduct; and remedial/disciplinary actions of PCSD personnel.

89. By virtue of his office, Defendant Bench is also vested with final decision-making authority over all PCSD policies, procedures, and orders. As such, Bench is required to periodically review and revise the departmental/institutional directives outlined in the PCJ Manual and the General Orders Manual – which are cooperatively promulgated with the Pulaski County Counselor/Attorney, with input from senior command staff – and sign/approve them before they are given effect.

90. During his tenure as a Lieutenant, Defendant Bench also materially and directly participated in and contributed to the promulgation and implementation of policies, procedures, and orders outlined in the PCJ Manual, governing the operations of the PCJ and the Jail Division, and the General Orders Manual, governing the overall operations of the PCSD.

91. Through his action/inaction on matters, processes, and concerns that impact the overall operations of the PCSD, Defendant Bench is similarly empowered to tacitly approve or otherwise give official effect to practices and customs.

92. At all relevant times contemplated herein, and while acting under color of state law, Defendant Doe held a position in the senior command staff of the PCSD.

93.     As a member of the senior command staff and administrator of the PCJ, Defendant Doe not only directly and materially participated in county budgetary processes that have a direct impact on PCSD staffing levels, jail conditions, and the management of prisoners, but he/she was also vested with, directly responsible for, and personally exercised final decision-making authority over the administration and day-to-day operations of the Jail Division/PCJ.  His/her mandatory functions included, *inter alia*, making determinations that concern: PCJ supervisory schemes and allocation of personnel/duty assignments; PCJ position job descriptions and duties; employment decisions and background screening of jailers; jail conditions; management and transport of prisoners; prisoner complaint investigation and resolution processes; and remedial/disciplinary actions of PCSD personnel assigned to the Jail Division/PCJ in cooperation with the Sheriff and other senior command staff.

94.     During his/her tenure on the senior command staff, Defendant Doe also materially and directly participated in and contributed to the promulgation and implementation of policies, procedures, and orders outlined in the PCJ Manual, governing the operations of the PCJ and the Jail Division, and the General Orders Manual, governing the overall operations of the PCSD.

95.     Through his/her action/inaction on matters, processes, and concerns that impact the overall operations of the Jail Division/PCJ, Defendant Doe was similarly empowered to tacitly approve or otherwise give official effect to practices and customs.

96.     The customs and practices observed by PCSD personnel assigned to the Jail Division/PCJ were tacitly approved and/or otherwise recklessly set in motion by Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe.  Said practices and

customs – outlined in detail in Paragraph 98 below– were so continuing, persistent, and widespread so as to constitute official policies, procedures, and actions/inactions.

97.     As set forth more fully in Paragraphs 19-20, above, the Jail Division/PCJ is responsible for prisoner transports.

98.     As set forth more fully in Paragraphs 21-24, above, the PCSD and the PCJ were chronically understaffed between 2013-2016.  As acting Sheriff, Defendant Long publicly stated in March 2016: "Right now the jail is minimally staffed."

99.     As set forth more fully in Paragraphs 26-29, above, the PCJ was chronically overcrowded between 2013-2016.  In July 2016, Defendant Long publicly stated: "Pulaski's jail has bunk space for 54 individuals, but jail numbers recently have been ranging from 80-90 inmates."

100.     As set forth more fully in Paragraphs 34-37, above, between 2006-2016, at least three (3) PCSD jailers were arrested and charged with the crime of having sexual contact with an inmate. Indeed, just four months prior to Defendant Sapp's sexual assault of S.L., PCSD jailer Angelica Black was arrested for and charged with having sexual contact with a prisoner.

101.     Collectively, the official policies, procedures, customs, practices, and actions/inactions promulgated, observed, tacitly authorized, and/or otherwise recklessly set in motion by Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe not only posed a substantial risk of serious harm to S. L. and were highly likely to occasion constitutional harms, but they also operated to deprive S. L. of her right to be free from cruel and unusual punishment by, *inter alia*, recklessly disregarding known risks to prisoner safety and vitiating the exercise of supervision, direction, and remedial control

of PCSD personnel, which, ultimately, culminated in a vicious sexual attack that served no legitimate penological purpose.

102. Said official policies, procedures, customs, practices, and actions/inactions subjected S. L. to the unnecessary and wanton infliction of pain in contravention of the Eighth Amendment and demonstrate a deliberate indifference to her right to bodily integrity and her right to privacy by occasioning and/or tacitly authorizing systemic deficiencies that include:

a. Failing to provide the PCSD and PCSD personnel with adequate resources and tools to meet departmental objectives and/or comply with prevailing correctional practices including, but not limited to, the allowance of single officer transport of offenders of the opposite sex;

b. Failing to utilize formal periodic auditing processes to apprise command staff on intra-agency compliance with established performance indicators, policies, standards, and internal controls;

c. Failing to utilize adequate staffing levels for the Jail Division/PCJ, such that personal interactions between PCSD personnel and prisoners often went undetected or were otherwise not scrutinized;

d. Failing to properly and routinely utilize and review existing monitoring devices – including PCJ video cameras, Rural-First GPS data, and internal patrol car cameras – to ensure the safe transport of prisoners;

e. Failing to utilize adequate supervisory and management schemes, such as direct supervision principles, so as to safeguard the rights of prisoners, ensure their safety, and minimize the potential for inappropriate contacts with PCSD personnel;

f.     Failing to protect prisoners from any sexual contact with or sexual exploitation by PCSD personnel;

g.     Failing to utilize adequate recruiting, hiring, and screening processes for PCSD personnel, including jailers;

h.     Failing to investigate and consider off-duty conduct in evaluating the performance of PCSD personnel;

i.     Failing to receive, investigate, and/or act on prisoner grievances and complaints of officer misconduct;

j.     Inculcating a fear of reprisal among prisoners, especially female prisoners, that compelled them not to report instances of officer sexual misconduct; and

k.     Fostering a Don't-Ask-Don't-Tell culture among Jail Division/PCJ personnel that allowed officers to exploit and objectify prisoners for their personal gratification with impunity.

103.     All of the eleven (11) systemic deficiencies outlined in Paragraph 102, above, are the product of official PCSD policies, procedures, customs, practices, and actions/inactions that were promulgated, occasioned, tacitly authorized, and/or recklessly set in motion by the County, Board, and Defendants Bench, Long, and Doe who were specifically vested with final decision-making authority in like matters – and all eleven (11) caused or materially contributed to: the systemic and deliberate indifference to S. L.'s constitutional right to be free from cruel and unusual punishment and the unnecessary and wanton infliction of pain.

104.     Said official policies, procedures, customs, practices, and actions/inactions, and those of the PCSD as a whole, which comprise the moving force

{11433/0001: 00380706.DOCX.}

behind S. L.'s injuries, operated to deprive S. L. of her right to bodily integrity, right to privacy, and right to equal protection under the law and, but for the same, she would not have been denied rights secured by the Eighth and Fourteenth Amendments to the United States Constitution.

105.    As a direct and proximate result of the violation of her civil rights by Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe, S. L. suffered the following injuries:

a.    She was subjected to multiple episodes of terrifying and humiliating sexual assault and sexual, physical contact at the hands of an officer of the law;

b.    She sustained embarrassment, humiliation, anxiety, and fear from being forcibly coerced into exposing herself and having explicit photographs taken of her while shackled and clad in prison attire; and

c.    She sustained enduring mental and emotional pain and anguish from being forcibly coerced into performing sexual acts against her will.

106.    Defendants Pulaski County, Pulaski Board, Bench, Long and Doe's acts and omissions were not only intentionally willful, wanton, reckless, and malicious – in that they are the product of conduct and deliberate policy choices made despite substantial risks of serious harm which Defendants knew were highly likely to occasion constitutional violations – but they also evince a complete and deliberate indifference to and/or a conscious and reckless disregard of the rights of S. L. and all prisoners in the custody of the PCSD. Therefore, S. L. is entitled to an award of punitive or exemplary damages in an amount sufficient to both punish and deter said Defendants and others from engaging in like conduct in the future.

{11433/0001: 00380706.DOCX.}

107.    S. L. is entitled to recover her reasonable attorney fees, costs, and expenses from Defendants Pulaski County, Pulaski Board, Bench, Long and Doe as provided by 42 U.S.C. § 1988.

## COUNT II – 42 U.S.C. § 1983
## FAILURE TO SUPERVISE, DIRECT, CONTROL, AND TRAIN
## (AGAINST DEFENDANTS PULASKI COUNTY, PULASKI BOARD, BENCH, LONG, AND DOE IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

108.    Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1 through 107, above.

109.    At all relevant times contemplated herein, and while acting under color of state law, Defendant Long served as the duly elected Sheriff of Defendant Pulaski County who preceded Defendant Bench.

110.    As Sheriff, Defendant Long not only directly and materially participated in county budgetary processes that have a direct impact on PCSD staffing levels, jail conditions, and the management of prisoners, but he was also vested with, directly responsible for, and personally exercised final decision-making authority over all aspects of departmental operations.  His mandatory functions included, *inter alia*, making determinations that concern: PCSD supervisory schemes and allocation of personnel/duty assignments; position job descriptions and duties; employment determinations and background screening of PCSD applicants; jail operations and conditions; management and transport of prisoners; citizen/prisoner complaint investigation and resolution processes involving PCSD deputies accused or suspected of misconduct; and remedial/disciplinary actions of PCSD personnel.

111.    As Sheriff, Defendant Long was not only vested with, directly responsible for, and materially exercised supervisory and oversight authority over all

PCSD deputies – including the authority to assess job performance, take remedial/corrective action, ensure compliance with departmental policies/procedures, develop staffing schedules and duty assignments, and make employment determinations – but his mandatory functions also included receiving, investigating, and acting on complaints involving misconduct of PCSD personnel in cooperation with senior command staff.

112. By operation of state law and PCSD policies/procedures, and by virtue of the mandatory functions of his office, Defendant Long was vested with the duty to exercise reasonable and adequate supervision, direction, control over PCSD personnel and to adequately train PCSD personnel so as to prevent said personnel from: engaging in undue familiarity with prisoners; coercing prisoners to expose themselves; making untoward advances and sexual comments to prisoners; deviating from prisoner transport policies/procedures and authorized prisoner transport routes; deviating from policies/procedures regarding in-car camera use; requiring utilization and review of existing monitoring devices; and generally being deliberately indifferent to the rights of prisoners.

113. At all relevant times contemplated herein, and while acting under color of state law, Defendant Bench held positions in the senior command staff of the PCSD, first as a Lieutenant and then as the duly elected Sheriff of Defendant Pulaski County.

114. As the duly elected Sheriff of Defendant Pulaski County, Defendant Bench not only directly and materially participates in county budgetary processes that have a direct impact on PCSD staffing levels, jail conditions, and the management of prisoners, but he is also vested with, directly responsible for, and personally exercises final decision-making authority over all aspects of departmental operations. His

mandatory functions include, *inter alia*, making determinations that concern: PCSD supervisory schemes and allocation of personnel/duty assignments; position job descriptions and duties; employment determinations and background screening of PCSD applicants; jail operations and conditions; management and transport of prisoners; citizen/prisoner complaint investigation and resolution processes involving PCSD deputies accused or suspected of misconduct; and remedial/disciplinary actions of PCSD personnel.

115.    As a Lieutenant and first-line supervisor, Defendant Bench was not only vested with, directly responsible for, and materially exercised supervisory and oversight authority over all PCSD deputies – including the authority to assess job performance, take remedial/corrective action, ensure compliance with departmental policies/procedures, develop staffing schedules and duty assignments, and make employment determinations – but his mandatory functions also included receiving, investigating, and acting on complaints involving misconduct of PCSD personnel in cooperation with the Sheriff and senior command staff.

116.    By operation of state law and PCSD policies/procedures, and by virtue of the mandatory functions of both his prior and current position within the PCSD, Defendant Bench was and is vested with the duty to exercise reasonable and adequate supervision, direction, and control over PCSD personnel and to adequately train PCSD personnel so as to prevent said personnel from: engaging in undue familiarity with prisoners; coercing prisoners to expose themselves; making untoward advances and sexual comments to prisoners; deviating from prisoner transport policies/procedures and authorized prisoner transport routes; deviating from policies/procedures regarding in-car

camera use; requiring utilization and review of existing monitoring devices; and generally being deliberately indifferent to the rights of prisoners.

117. At all relevant times contemplated herein, and while acting under color of state law, Defendant Doe held a position in the senior command staff of the PCSD.

118. As a member of the senior command staff, Defendant Doe not only directly and materially participated in county budgetary processes that have a direct impact on PCSD staffing levels, jail conditions, and the management of prisoners, but he/she was also vested with, directly responsible for, and personally exercised final decision-making authority over the administration and day-to-day operations of the Jail Division/PCJ. His/her mandatory functions included, *inter alia*, making determinations that concern: PCJ supervisory schemes and allocation of personnel/duty assignments; PCJ position job descriptions and duties; employment decisions and background screening of jailers; jail conditions; management and transport of prisoners; prisoner complaint investigation and resolution processes; and remedial/disciplinary actions of PCSD personnel assigned to the Jail Division/PCJ in cooperation with the Sheriff and other senior command staff.

119. By operation of state law and PCSD policies/procedures, and by virtue of the mandatory functions of his/her office, Defendant Doe was vested with the duty to exercise reasonable and adequate supervision, direction, and control over PCSD personnel assigned to the Jail Division/PCJ and to adequately train said personnel so as to prevent them from: engaging in undue familiarity with prisoners; coercing prisoners to expose themselves; making untoward advances and sexual comments to prisoners; deviating from prisoner transport policies/procedures and authorized prisoner transport routes; deviating from policies/procedures regarding in-car camera use; requiring

utilization and review of existing monitoring devices; and generally being deliberately indifferent to the rights of prisoners.

120.    As set forth more fully in Paragraphs 19-20, above, the Jail Division/PCJ is responsible for prisoner transports.

121.    As set forth more fully in Paragraphs 21-24, above, the PCSD and the PCJ were chronically understaffed between 2013-2016.  As acting Sheriff, Defendant Long publicly stated in March 2016: "Right now the jail is minimally staffed."

122.    As set forth more fully in Paragraphs 26-29, above, the PCJ was chronically overcrowded between 2013-2016.  In July 2016, Defendant Long publicly stated: "Pulaski's jail has bunk space for 54 individuals, but jail numbers recently have been ranging from 80-90 inmates."

123.    As set forth more fully in Paragraphs 34-37, above, between 2006-2016, at least three (3) PCSD jailers were arrested and charged with the crime of having sexual contact with an inmate.  Just four months prior to Defendant Sapp's sexual assault of S.L., PCSD jailer Angelica Black was arrested for and charged with having sexual contact with a prisoner.

124.    Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe failed to adequately supervise, discipline, control, and train PCSD personnel – including those assigned to the Jail Division/PCJ and those assigned to prisoner transports – to ensure that: they generally acted to safeguard the rights of prisoners and that they did not engage in the specific types of conduct outlined in Paragraphs 112, 116, and 119 above.

125.    The failure of Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe to exercise such supervision, direction, and control, and to adequately train their personnel, not only resulted in the systemic deficiencies outlined in Paragraph 102,

above, but it also recklessly posed substantial risks of serious harm to the health and safety of all prisoners in the custody of the PCSD, including S. L., because it operated to deprive them of their Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment and the unnecessary and wanton infliction of pain. Said failure comprised the moving force behind the violation of S. L.'s constitutional rights.

126.    But for the failure of Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe to properly, reasonably, and adequately supervise, direct, control, and train PCSD and PCJ personnel, S. L.'s constitutional rights would not have been violated and she would not have been injured.

127.    As a direct and proximate result of the violation of her civil rights by Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe, S. L. suffered the injuries more specifically outlined in Paragraph 105, above.

128.    Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe's acts and omissions were not only intentionally willful, wanton, reckless, and malicious – in that they are the product of conduct and deliberate policy choices made despite substantial risks of serious harm which Defendants knew were highly likely to occasion constitutional violations – but they also evince a complete and deliberate indifference to and/or a conscious and reckless disregard of the rights of S. L. and all prisoners in the custody of the PCSD. Therefore, S. L. is entitled to an award of punitive or exemplary damages in an amount sufficient to both punish and deter said Defendants and others from engaging in like conduct in the future.

129.    S. L. is entitled to recover her reasonable attorney fees, costs, and expenses from Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe as provided by 42 U.S.C. § 1988.

## COUNT III – 42 U.S.C. § 1983

## NEGLIGENT RETENTION

## (AGAINST DEFENDANTS PULASKI COUNTY, PULASKI BOARD, BENCH, LONG, AND DOE IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1 through 129, above.

130.    At all relevant times contemplated herein, and while acting under color of state law, the County had the power to make hiring and firing decisions in regard to PCSD and PCJ personnel.

131.    As Sheriff, Defendant Long not only directly and materially participated in county budgetary processes that have a direct impact on PCSD staffing levels, jail conditions, and the management of prisoners, but he was also vested with, directly responsible for, and personally exercised final decision-making authority over all aspects of departmental operations.  His mandatory functions included, *inter alia*, making determinations that concern: PCSD supervisory schemes and allocation of personnel/duty assignments; position job descriptions and duties; employment determinations and background screening of PCSD applicants; jail operations and conditions; management and transport of prisoners; citizen/prisoner complaint investigation and resolution processes involving PCSD deputies accused or suspected of misconduct; and remedial/disciplinary actions of PCSD personnel.

132.    As Sheriff, Defendant Long was not only vested with, directly responsible for, and materially exercised supervisory and oversight authority over all PCSD deputies – including the authority to assess job performance, take remedial/corrective action, ensure compliance with departmental policies/procedures, develop staffing schedules and duty assignments, and make employment determinations

– but his mandatory functions also included receiving, investigating, and acting on complaints involving misconduct of PCSD personnel in cooperation with senior command staff.

133. By operation of state law and PCSD policies/procedures, and by virtue of the mandatory functions of his office, Defendant Long was vested with the duty to exercise reasonable and adequate supervision, direction, control over PCSD personnel and to adequately train PCSD personnel so as to prevent said personnel from: engaging in undue familiarity with prisoners; coercing prisoners to expose themselves; making untoward advances and sexual comments to prisoners; deviating from prisoner transport policies/procedures and authorized prisoner transport routes; deviating from policies/procedures regarding in-car camera use; requiring utilization and review of existing monitoring devices; and generally being deliberately indifferent to the rights of prisoners.

134. At all relevant times contemplated herein, and while acting under color of state law, Defendant Bench held positions in the senior command staff of the PCSD, first as a Lieutenant and then as the duly elected Sheriff of Defendant Pulaski County.

135. As the duly elected Sheriff of Defendant Pulaski County, Defendant Bench not only directly and materially participates in county budgetary processes that have a direct impact on PCSD staffing levels, jail conditions, and the management of prisoners, but he is also vested with, directly responsible for, and personally exercises final decision-making authority over all aspects of departmental operations. His mandatory functions include, *inter alia*, making determinations that concern: PCSD supervisory schemes and allocation of personnel/duty assignments; position job descriptions and duties; employment determinations and background screening of PCSD

applicants; jail operations and conditions; management and transport of prisoners; citizen/prisoner complaint investigation and resolution processes involving PCSD deputies accused or suspected of misconduct; and remedial/disciplinary actions of PCSD personnel.

136.     As a Lieutenant and first-line supervisor, Defendant Bench was not only vested with, directly responsible for, and materially exercised supervisory and oversight authority over all PCSD deputies – including the authority to assess job performance, take remedial/corrective action, ensure compliance with departmental policies/procedures, develop staffing schedules and duty assignments, and make employment determinations – but his mandatory functions also included receiving, investigating, and acting on complaints involving misconduct of PCSD personnel in cooperation with the Sheriff and senior command staff.

137.     By operation of state law and PCSD policies/procedures, and by virtue of the mandatory functions of both his prior and current position within the PCSD, Defendant Bench was and is vested with the duty to exercise reasonable and adequate supervision, direction, and control over PCSD personnel and to adequately train PCSD personnel so as to prevent said personnel from: engaging in undue familiarity with prisoners; coercing prisoners to expose themselves; making untoward advances and sexual comments to prisoners; deviating from prisoner transport policies/procedures and authorized prisoner transport routes; deviating from policies/procedures regarding in-car camera use; requiring utilization and review of existing monitoring devices; and generally being deliberately indifferent to the rights of prisoners.

138.     At all relevant times contemplated herein, and while acting under color of state law, Defendant Doe held a position in the senior command staff of the PCSD.

139.     As a member of the senior command staff, Defendant Doe not only directly and materially participated in county budgetary processes that have a direct impact on PCSD staffing levels, jail conditions, and the management of prisoners, but he/she was also vested with, directly responsible for, and personally exercised final decision-making authority over the administration and day-to-day operations of the Jail Division/PCJ.  His/her mandatory functions included, *inter alia*, making determinations that concern: PCJ supervisory schemes and allocation of personnel/duty assignments; PCJ position job descriptions and duties; employment decisions and background screening of jailers; jail conditions; management and transport of prisoners; prisoner complaint investigation and resolution processes; and remedial/disciplinary actions of PCSD personnel assigned to the Jail Division/PCJ in cooperation with the Sheriff and other senior command staff.

140.     By operation of state law and PCSD policies/procedures, and by virtue of the mandatory functions of his/her office, Defendant Doe was vested with the duty to exercise reasonable and adequate supervision, direction, and control over PCSD personnel assigned to the Jail Division/PCJ and to adequately train said personnel so as to prevent them from: engaging in undue familiarity with prisoners; coercing prisoners to expose themselves; making untoward advances and sexual comments to prisoners; deviating from prisoner transport policies/procedures and authorized prisoner transport routes; deviating from policies/procedures regarding in-car camera use; requiring utilization and review of existing monitoring devices; and generally being deliberately indifferent to the rights of prisoners.

141.     Upon further information and belief, Defendant Sapp hit and killed a pedestrian with his patrol vehicle in 2008.

142.    Upon further information and belief, Pulaski County settled a civil lawsuit brought by the family of the pedestrian killed by Defendant Sapp in 2009.

143.    Upon further information and belief, Pulaski County and the PCSD failed to meaningfully investigate Defendant Sapp's fitness for duty and retained his employment despite his demonstrated propensity for violating the rights of individuals he swore to protect as an officer of the PCSD

144.    Upon further information and belief, a PCJ inmate brought suit against Defendant Sapp regarding a 2006 prison rape by one of Sapp's fellow jailers.

145.    Upon further information and belief, the PCJ inmate's civil lawsuit alleged, in part, that Defendant Sapp denied the inmate necessary medical attention thereby violating her constitutional rights.

146.    Upon information and belief, the County and Defendant Sapp settled this lawsuit in 2009.

147.    Upon further information and belief, Pulaski County and PCSD failed to meaningfully investigate the allegations against Defendant Sapp and retained his employment despite his demonstrated propensity for violating the rights of individuals he swore to protect as an officer of the PCSD.

148.    Upon further information and belief, and during all relevant times contemplated herein, multiple PCSD personnel assigned to the PCJ, including Defendant Sapp, engaged in sexual misconduct with prisoners on multiple occasions by brokering contraband for sexual favors, inappropriately touching prisoners through the bars in their cell doors, coercing prisoners to expose themselves or shower in view of PCSD, and taunting prisoners with sexual innuendos.

149.     Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe were solely responsible for hiring and retaining Defendant Sapp.

150.     Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe had actual knowledge or should have known that Defendant Sapp behaved in a sexually inappropriate manner with inmates.

151.     Defendant Sapp's inappropriate behavior was foreseeable conduct and consistent with Defendant Sapp's dangerous proclivities and recklessness with his vehicle, which Defendants knew or should have known.

152.     Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe's hiring and retention of Defendant Sapp was a proximate cause of Plaintiff's injuries.

153.     The failure of Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe to properly investigate Defendant Sapp's conduct and terminate his employment with the PCSD not only resulted in the systemic deficiencies outlined in Paragraph 105, above, but it also recklessly posed substantial risks of serious harm to the health and safety of all prisoners in the custody of the PCSD, including S. L., because it operated to deprive them of their Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment and the unnecessary and wanton infliction of pain. Said failure comprised the moving force behind the violation of S. L.'s constitutional rights.

154.     But for the failure of Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe to properly investigate Defendant Sapp's conduct and terminate his employment with the PCSD, S. L.'s constitutional rights would not have been violated and she would not have been injured.

155.    As a direct and proximate result of the violation of her civil rights by Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe, S. L. suffered the injuries more specifically outlined in Paragraph 105, above.

156.    Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe's acts and omissions were not only intentionally willful, wanton, reckless, and malicious – in that they are the product of conduct and deliberate policy choices made despite substantial risks of serious harm which Defendants knew were highly likely to occasion constitutional violations – but they also evince a complete and deliberate indifference to and/or a conscious and reckless disregard of the rights of S. L. and all prisoners in the custody of the PCSD.  Therefore, S. L. is entitled to an award of punitive or exemplary damages in an amount sufficient to both punish and deter said Defendants and others from engaging in like conduct in the future.

157.    S. L. is entitled to recover her reasonable attorney fees, costs, and expenses from Defendants Pulaski County, Pulaski Board, Bench, Long, and Doe as provided by 42 U.S.C. § 1988.

### COUNT IV – 42 U.S.C. § 1983
### LIABILITY FOR VIOLATIONS OF THE EIGHTH AND FOURTEENTH AMENDMENTS
### (AGAINST DEFENDANT SAPP IN HIS INDIVIDUAL CAPACITY)

158.    Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1-157, above.

159.    At all relevant times contemplated herein, and while acting under color of state law, Defendant served as a Corporal and a Senior Transport Officer of the PCSD who was authorized to and regularly transported prisoners.

160. As set forth more fully in Paragraphs 56 and 58, above, on December 20, 2016, the Circuit Court of Pulaski County, Missouri issued a Writ directing that S. L. be transported from the CCC in Chillicothe to Waynesville for a hearing on January 4, 2017. On December 29, 2016, Defendant Sapp was assigned to execute the Writ and transport S. L. from Chillicothe to Waynesville for her court appearance.

161. As set forth in Paragraph 59, above, on December 29, 2016, Defendant Sapp arrived at the CCC in Chillicothe in a fully marked PCSD patrol car and was attired in his official PCSD uniform. Pursuant to the Writ, MDOC transferred custody of S. L. to Sapp, which, as a sworn officer, he assumed on behalf of the PCSD. At the time Sapp assumed custody of S. L. for the PCSD, she was shackled and clad in MDOC-issued prisoner attire.

162. During the transport from Chillicothe to Waynesville, as set forth more fully in Paragraphs 60-65, above, Defendant Sapp, *inter alia*:

    a.    Made solicitous comments to S. L. about her body and her figure, telling her she was "beautiful" and that he wanted to take pictures of her so he could look at them later;

    b.    Made one unauthorized stop in a commuter parking lot, where he coerced S. L. into exposing herself, taking nine (9) explicit photographs of her in the back seat of his PCSD patrol car while she was shackled;

    c.    Made a second unauthorized stop on a remote river access road, where he stepped out of the car, relieved himself, and exposed his penis to S. L., shaking it at her;

d.     Coerced S. L. into getting in the front seat of his PCSD patrol car, where, against her will and without her consent, he put his hand down her MDOC-issued pants and penetrated her vagina with his finger;

e.     Exposed his penis to S. L. a second time, undoing his uniform pants and coercing her to perform oral sex on him, during which he ejaculated in her mouth; and

f.     Told S. L. he was a well-known and respected officer, that no one would believe her if she said anything to anyone about what he had done, and threatened her with repercussions in Pulaski County if she did.

163.     As set forth in Paragraph 66, above, Defendant Sapp gave S. L. a tissue to clean herself after he ejaculated in her mouth, which she kept as evidence.

164.     As set forth more fully in Paragraphs 67-70: S. L. reported the attack; the MSHP recovered explicit photos of S. L. from Sapp's cell phone, which he later admitted taking; Rural-First GPS data confirmed that Sapp made two (2) unauthorized stops; the MSHP crime lab determined that genetic material recovered from the tissue matches Sapp's DNA; and Sapp was subsequently arrested and charged with the crime of having sexual contact with an inmate.

165.     As set forth more fully in Paragraph 34, above, Defendant Sapp is also believed to have engaged in other instances of sexual misconduct involving prisoners in the custody of the PCSD, including, *inter alia*: brokering contraband for sexual favors, inappropriately touching prisoners through the bars in their cell doors, coercing prisoners to expose themselves, and taunting prisoners with sexual innuendos.

166.     At the hands of Defendant Sapp, S. L. suffered from the unnecessary and wanton infliction of pain occasioned by a terrifying and humiliating sexual assault that

not only served no legitimate penological purpose, but was utterly unrelated to any permissible criminal penalty that could have ultimately been imposed by law.

167.  S. L.'s injuries, which were inflicted by Sapp under color of state law, while he was in uniform and she was shackled, were the product of his deliberate indifference to her right to bodily integrity, right to privacy, and right to equal protection under the law in violation of the Eighth and Fourteenth Amendments.

168.  Defendant Sapp's conduct also operated to deprive S. L. of substantive due process rights secured by the Fourteenth Amendment to the United States Constitution, and, but for the same, she would not have been injured.  As such, Sapp's conduct interferes with rights implicit in the concept of ordered liberty because it is shocking to the conscience and offensive to human dignity.

169.  As a direct and proximate result of the violation of her civil rights by Defendant Sapp, S. L. suffered the injuries more specifically outlined in Paragraph 105, above.

170.  Defendant Sapp's acts were not only intentionally willful, wanton, malicious, and outrageous, but they also evince a complete and deliberate indifference to S. L.'s constitutional rights.  Therefore, S. L. is entitled to an award of punitive or exemplary damages in an amount sufficient to both punish Sapp and deter others from engaging in like conduct in the future.

171.  S. L. is entitled to recover her reasonable attorney fees, costs, and expenses from Defendant Sapp as provided by 42 U.S.C. § 1988.

## COUNT V – STATE LAW CLAIM
## NEGLIGENCE
## (AGAINST DEFENDANTS BENCH, LONG, AND DOE IN THEIR
## INDIVIDUAL CAPACITIES)

172. Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1-171, above.

173. Defendants Bench, Long, and Doe had a duty to ensure that: prisoners, including S. L., were safely transported to and from court appearances; PCSD personnel, including Defendant Sapp, complied with departmental policies, procedures, and orders; the rights of prisoners were generally safeguarded.

174. Defendants Bench, Long, and Doe breached said duties by failing to, *inter alia*, exercise reasonable and ordinary care, skill, and diligence in: complying with prevailing correctional practices, including, but not limited to, the allowance of single officer transport of offenders of the opposite sex; maintaining adequate staffing levels; utilizing adequate supervisory and management schemes; utilizing and reviewing existing monitoring devices, including Rural-First GPS data and patrol car video cameras; and utilizing adequate recruiting, hiring, and screening processes.

175. But for Defendants Bench, Long, and Doe's deviation from generally accepted and recognized correctional practices and the failures outlined in Paragraph 139, above, S. L. would not have been injured.

176. As a direct and proximate result of Defendants Bench, Long, and Doe's negligence, S. L. was injured and damaged as specifically set forth in Paragraph 105, above.

177. Defendants Bench, Long, and Doe's actions and omissions contemplate a reckless disregard for the consequences. Therefore, S. L. is entitled to an award of

punitive or exemplary damages in an amount sufficient to both punish said Defendants and deter others from engaging in like conduct in the future.

178.    Defendants Bench, Long, and Doe are jointly and severally liable for S. L.'s injuries and damages.

## COUNT VI – STATE LAW CLAIM

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST DEFENDANTS BENCH, LONG, AND DOE IN THEIR INDIVIDUAL CAPACITIES)

179.    Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1-178, above.

1180.   Defendants Bench, Long, and Doe had a duty to ensure that: prisoners, including S. L., were safely transported to and from court appearances; PCSD personnel, including Defendant Sapp, complied with departmental policies, procedures, and orders; the rights of prisoners were generally safeguarded.

1181.   Defendants Bench, Long, and Doe breached said duties by failing to, *inter alia*, exercise reasonable and ordinary care, skill, and diligence in: complying with prevailing correctional practices including, but not limited to, the allowance of single officer transport of offenders of the opposite sex; maintaining adequate staffing levels; utilizing adequate supervisory and management schemes; utilizing and reviewing existing monitoring devices, including Rural-First GPS data and patrol car video cameras; and utilizing adequate recruiting, hiring, and screening processes.

182.    But for Defendants Bench, Long, and Doe's deviation from generally accepted and recognized correctional practices and the failures outlined in Paragraph 146, above, S. L. would not have been injured.

183. Defendants Bench, Long, and Doe knew or should have known that the failures outlined in Paragraph 102, above – which were exacerbated by chronic underfunding and understaffing, as well as prior instances of officer sexual misconduct – created conditions that posed an unreasonable risk of causing the kind of emotional distress and mental injuries suffered by S. L.

184. As a direct and proximate result of Defendants Bench, Long, and Doe's negligence, S. L. was emotionally and mentally injured and damaged as specifically set forth in Paragraph 105, above.

185. Defendants Bench, Long, and Doe's actions and omissions contemplate a reckless disregard for the consequences. Therefore, S. L. is entitled to an award of punitive or exemplary damages in an amount sufficient to both punish said Defendants and deter others from engaging in like conduct in the future.

186. Defendants Bench, Long, and Doe are jointly and severally liable for S. L.'s injuries and damages.

## COUNT VII – STATE LAW CLAIM
## ASSAULT AND BATTERY
## (AGAINST DEFENDANT SAPP IN HIS INDIVIDUAL CAPACITY)

187. Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1-186, above.

188. As set forth more fully in Paragraphs 56 and 58, above, on December 20, 2016, the Circuit Court of Pulaski County, Missouri issued a Writ directing that S. L. be transported from the CCC in Chillicothe to Waynesville for a hearing on January 4, 2017. On December 29, 2016, Defendant Sapp was assigned to execute the Writ and transport S. L. from Chillicothe to Waynesville for her court appearance.

189.     During the transport from Chillicothe to Waynesville, as set forth more fully in Paragraphs 60-65, above, Defendant Sapp, *inter alia*:

    a.      Made solicitous comments to S. L. about her body and her figure, telling her she was "beautiful" and that he wanted to take pictures of her so he could look at them later;

    b.      Made one unauthorized stop in a commuter parking lot, where he coerced S. L. into exposing herself, taking nine (9) explicit photographs of her in the back seat of his PCSD patrol car while she was shackled;

    c.      Made a second unauthorized stop on a remote river access road, where he stepped out of the car, relieved himself, and exposed his penis to S. L., shaking it at her;

    d.      Coerced S. L. into getting in the front seat of his PCSD patrol car, where, against her will and without her consent, he put his hand down her MDOC-issued pants and penetrated her vagina with his finger;

    e.      Exposed his penis to S. L. a second time, undoing his uniform pants and coercing her to perform oral sex on him, during which he ejaculated in her mouth; and

    f.      Told S. L. he was a well-known and respected officer, that no one would believe her if she said anything to anyone about what he had done, and threatened her with repercussions in Pulaski County if she did.

190.     But for Defendant Sapp's harmful and offensive contacts with S. L.'s person, as outlined in Paragraph 189, above, and her apprehension of the same, S. L. would not have been injured.

191. As a direct and proximate result of Defendant Sapp's conduct, S. L. was injured and damaged as specifically set forth in Paragraph 105, above.

192. Defendant Sapp's acts were intentionally willful, wanton, and outrageous. Therefore, S. L. is entitled to an award of punitive or exemplary damages in an amount sufficient to both punish Sapp and deter others from engaging in like conduct in the future.

193. Defendant Sapp is liable for S. L.'s injuries and damages.

**COUNT VIII – STATE LAW CLAIM**
**NEGLIGENCE PER SE**
**(AGAINST DEFENDANT SAPP IN HIS INDIVIDUAL CAPACITY)**

194. Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1-193, above.

195. As set forth more fully in Paragraphs 56 and 58, above, on December 20, 2016, the Circuit Court of Pulaski County, Missouri issued a Writ directing that S. L. be transported from the CCC in Chillicothe to Waynesville for a hearing on January 4, 2017. On December 29, 2016, Defendant Sapp was assigned to execute the Writ and transport S. L. from Chillicothe to Waynesville for her court appearance.

196. During the transport from Chillicothe to Waynesville, as set forth more fully in Paragraphs 60-65, above, Defendant Sapp, *inter alia*:

    a.    Made solicitous comments to S. L. about her body and her figure, telling her she was "beautiful" and that he wanted to take pictures of her so he could look at them later;

    b.    Made one unauthorized stop in a commuter parking lot, where he coerced S. L. into exposing herself, taking nine (9) explicit photographs of her in the back seat of his PCSD patrol car while she was shackled;

c. Made a second unauthorized stop on a remote river access road, where he stepped out of the car, relieved himself, and exposed his penis to S. L., shaking it at her;

d. Coerced S. L. into getting in the front seat of his PCSD patrol car, where, against her will and without her consent, he put his hand down her MDOC-issued pants and penetrated her vagina with his finger;

e. Exposed his penis to S. L. a second time, undoing his uniform pants and coercing her to perform oral sex on him, during which he ejaculated in her mouth; and

f. Told S. L. he was a well-known and respected officer, that no one would believe her if she said anything to anyone about what he had done, and threatened her with repercussions in Pulaski County if she did.

197. Section 566.145 RSMo. prohibits a person who is "an employee of, or assigned to work in, any jail, prison or correctional facility" from engaging in "sexual conduct with a prisoner or an offender who is confined in a jail, prison, or correctional facility[.]" The prohibitions of the statute extend to prisoner transports.

198. S. L. was in the custody of the PCSD when the transport began, and, as such, was a member of the class of persons Section 566.145 RSMo. was intended to protect.

199. Defendant Sapp's conduct, outlined in Paragraph 196, above, contemplates sexual acts prohibited by Section 566.145 RSMo. and her injuries, which are specifically set forth in Paragraph 105, above, contemplate those the statute was intended to prevent.

200.    As a direct and proximate result of Defendant Sapp's violation of Section 566.145 RSMo., S. L. was injured and damaged as specifically set forth in Paragraph 105, above.

201.    Defendant Sapp's acts were intentionally willful, wanton, and outrageous. Therefore, S. L. is entitled to an award of punitive or exemplary damages in an amount sufficient to both punish Sapp and deter others from engaging in like conduct in the future.

202.    Defendant Sapp is liable for S. L.'s injuries and damages.

## COUNT IX – STATE LAW CLAIM
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST DEFENDANT SAPP IN HIS INDIVIDUAL CAPACITY)

203.    Plaintiff hereby adopts, re-alleges, and incorporates by reference the allegations contained in Paragraphs 1-202, above.

204.    As set forth more fully in Paragraphs 56 and 58, above, on December 20, 2016, the Circuit Court of Pulaski County, Missouri issued a Writ directing that S. L. be transported from the CCC in Chillicothe to Waynesville for a hearing on January 4, 2017. On December 29, 2016, Defendant Sapp was assigned to execute the Writ and transport S. L. from Chillicothe to Waynesville for her court appearance.

205.    During the transport from Chillicothe to Waynesville, as set forth more fully in Paragraphs 60-65, above, Defendant Sapp, *inter alia*:

   a.    Made solicitous comments to S. L. about her body and her figure, telling her she was "beautiful" and that he wanted to take pictures of her so he could look at them later;

b.      Made one unauthorized stop in a commuter parking lot, where he coerced S. L. into exposing herself, taking nine (9) explicit photographs of her in the back seat of his PCSD patrol car while she was shackled;

c.      Made a second unauthorized stop on a remote river access road, where he stepped out of the car, relieved himself, and exposed his penis to S. L., shaking it at her;

d.      Coerced S. L. into getting in the front seat of his PCSD patrol car, where, against her will and without her consent, he put his hand down her MDOC-issued pants and penetrated her vagina with his finger;

e.      Exposed his penis to S. L. a second time, undoing his uniform pants and coercing her to perform oral sex on him, during which he ejaculated in her mouth; and

f.      Told S. L. he was a well-known and respected officer, that no one would believe her if she said anything to anyone about what he had done, and threatened her with repercussions in Pulaski County if she did.

206.    Defendant Sapp's conduct during the transport, outlined in Paragraph 205, above, was not only extreme and outrageous, but it was also intentional.

207.    As a direct and proximate result of Defendant Sapp's deliberate conduct, S. L. was emotionally and mentally injured and damaged as specifically set forth in Paragraph 105, above.

208.    Defendant Sapp's acts were intentionally willful, wanton, and outrageous. Therefore, S. L. is entitled to an award of punitive or exemplary damages in an amount sufficient to both punish Sapp and deter others from engaging in like conduct in the future.

209. Defendant Sapp is liable for S. L.'s injuries and damages.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing considerations, Plaintiff S. L. requests that this Court, after a trial by jury of their peers, enter Judgment against Defendants for actual and compensatory damages, nominal damages, and exemplary or punitive damages as are proven at trial; for reasonable attorney fees, costs, and expenses incurred herein; and for such further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted,

SHAFFER LOMBARDO SHURIN, PC

/s/ James D. Myers

| James D. Myers | #46374 |
| Jennifer J. Price | #48800 |

Rachael D. Longhofer
2001 Wyandotte Street
Kansas City, MO 64108
(816) 931-0500
(816) 931-5775 – Fax
jmyers@sls-law.com
jprice@sls-law.com
rlonghofer@sls-law.com
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 25, 2019, a copy of the foregoing was electronically filed with the Clerk of this Court, by using the Court's CM/ECF system, which provides electronic notice to all counsel of record.

/s/ James D. Myers